IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

TRACEY KAY STOLL-MINER,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

No. C09-0096

RULING ON JUDICIAL REVIEW

_____

## TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   PRINCIPLES OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.    FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       A.    Stoll-Miner's Education and Employment Background. . . . . . . . . . 5
       B.    Administrative Hearing Testimony. . . . . . . . . . . . . . . . . . . 5
             1.    Stoll-Miner's Testimony. . . . . . . . . . . . . . . . . . . . 5
             2.    Vocational Expert's Testimony. . . . . . . . . . . . . . . . . 9
       C.    Stoll-Miner's Medical History. . . . . . . . . . . . . . . . . . . . 10

V.     CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       A.    ALJ's Disability Determination.. . . . . . . . . . . . . . . . . . . 16
       B.    Objections Raised By Claimant. . . . . . . . . . . . . . . . . . . . 18
             1.    Depression. . . . . . . . . . . . . . . . . . . . . . . . . . 18
             2.    Opinions of Drs. Sarin and Ely. . . . . . . . . . . . . . . . 22
             3.    Credibility Determination. . . . . . . . . . . . . . . . . . 26
       C.    Reversal or Remand. . . . . . . . . . . . . . . . . . . . . . . . . 28

VI.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VII.   ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Tracey Kay Stoll-Miner on July 22, 2009, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Stoll-Miner asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Stoll-Miner requests the Court to remand this matter for further proceedings.

# II. PROCEDURAL BACKGROUND

On November 7, 2005, Stoll-Miner applied for both disability insurance benefits and SSI benefits. In her applications, Stoll-Miner alleged an inability to work since May 20, 2002 due to emphysema, fibromyalgia, and depression. Stoll-Miner's applications were denied on May 19, 2006. On December 4, 2006, her applications were denied on reconsideration. On January 10, 2007, Stoll-Miner requested an administrative hearing before an Administrative Law Judge ("ALJ"). On December 22, 2008, Stoll-Miner appeared via video conference with her attorney before ALJ Alice Jordan for an administrative hearing. Stoll-Miner and vocational expert George B. Paprocki testified at the hearing. In a decision dated February 2, 2009, the ALJ denied Stoll-Miner's claims. The ALJ determined that Stoll-Miner was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing her past relevant work as a hotel manager and an eye specialist. The ALJ also determined that in the alternative, even if Stoll-Miner could not perform her past relevant work, she could perform other work that exists in significant numbers in the national economy. Stoll-Miner appealed the ALJ's decision. On May 20, 2009, the Appeals Council denied Stoll-Miner's request for review. Consequently, the ALJ's February 2, 2009 decision was adopted as the Commissioner's final decision.

On July 22, 2009, Stoll-Miner filed this action for judicial review. The Commissioner filed an Answer on September 21, 2009. On December 21, 2009, Stoll-Miner filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she could perform her past relevant work or other work that exists in significant numbers in the national economy. On February 22, 2010, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On September 1, 2009, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision 'if the ALJ's findings are supported by substantial evidence on the record as a whole[.]'" *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)); *see also Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'Substantial evidence is less than a preponderance, but enough that

a reasonable mind might accept as adequate to support a conclusion.' *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 848 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Moore*, 572 F.3d at 522 ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005)."); *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) ("As long as

substantial evidence in the record supports the Commissioner's decision, we may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.").

## IV. FACTS

### A. Stoll-Miner's Education and Employment Background

Stoll-Miner was born in 1968. She completed four years of high school, but did not graduate because she was two credits shy of the graduation requirements. Stoll-Miner did not return to school, or earn the remaining two credits necessary for graduation. She also never earned a GED.

The record contains a detailed earnings report for Stoll-Miner. The report covers Stoll-Miner's employment history from 1978 to 2008. She had no earnings from 1978 to 1983. Stoll-Miner had a large range of earnings from 1984 to 2002, including a low of $211.50 (1984) to a high of $16,001.66 (2001). She had no earnings in 2003, and earned $220.50 in 2004. Stoll-Miner has no earnings since 2005.

### B. Administrative Hearing Testimony

#### 1. Stoll-Miner's Testimony

At the administrative hearing, the ALJ began her questioning by inquiring when Stoll-Miner last had a regular job. Stoll-Miner replied that she last worked as a general manager in a hotel until 2002. She quit the hotel job after her sister was murdered and she relapsed on drugs. The ALJ asked Stoll-Miner to describe her drug problems. Stoll-Miner explained that:

> I was using cocaine but then got clean and I was clean for about two and a half years I think it is. And then my sister got murdered and I relapsed but I haven't used since November 17 of 2004, so I'm doing okay. I won't even take the pain pills that the doctors prescribed for my pain because I'm scared I'd relapse.

(Administrative Record at 36.)

Next, the ALJ asked Stoll-Miner to explain why she hadn't worked since 2002:

> Q: So then you [] relapse[d,] and then in '04 you did a
> little bit of work. Where and why have you not done
> any work since then?
>
> A: The pain.
>
> Q: What pain?
>
> A: It's -- okay. First my lungs. I have a hard time
> breathing and I did that to myself. The pain --
>
> Q: What do --
>
> A: -- as far as the fibromyalgia. I ache constantly 24 hours
> a day. If I stay in one position too long I'm sore. I
> can't stand. My legs can't handle the weight very long.
> My hands cramp up. I don't even cross-stitch anymore
> because of my hands. So its everywhere. It's in my
> lower back. It's in my knees. I can't lift any form of
> weight.
>
> Q: What is wrong with your lungs?
>
> A: I have COPD. I have a really hard time breathing. If
> I do any form of walking at all I'm out of breath.

(Administrative Record at 37-38.) The ALJ also asked Stoll-Miner why she believed she was unable to work at a sedentary job. Stoll-Miner answered that the pain from her fibromyalgia would make sitting for an eight-hour workday very difficult. She stated "I'm in pain constantly. I move from my couch to my chair, my bed to the couch to the chair to the bed. I don't do the stairs. I have the kids -- neighbor kids who come walk my dog for me because I don't even walk my own dog."[1] Stoll-Miner testified that she takes some medication for pain relief, such as Ibuprofen and Nortriptyline, but it only dulls the pain. The ALJ further asked why Stoll-Miner believed she couldn't work, even with pain medication:

> Q: . . . You're taking several things here that should help
> alleviate some of the pain.
>
> A: And they do help alleviate it. It's not as bad as it could
> be. . . .
>
> Q: But you don't believe that you still could do a job?
>
> A: I have tried. Yeah, but I've been working my whole
> life. I don't want to sit at home but I can't hold down

---

[1] *See* Administrative Record at 38.

> a job and when I wake up in pain that's so bad I can't see straight what job's going to hire me on me missing two or three days a week?
>
> Q: What makes you think you'd miss two or three days a week?
>
> A: The same reason I left Casey's. I went down there and worked for them for a week and a half. I was in so much pain every day.

(Administrative Record at 39-40.)

Next, the ALJ asked Stoll-Miner to describe her pain. Stoll-Miner testified that she suffers from back aches, pain in her hips, fingers, and ankles, and constant muscle spasms. The ALJ also questioned Stoll-Miner regarding her typical daily activities:

> Q: How much television do you watch during the day?
>
> A: Probably about three hours in the day and then probably about three hours in the evening. . . .
>
> Q: And do you do your own cooking?
>
> A: I do a lot of quick cooking. A lot of things I can microwave.
>
> Q: How about your laundry?
>
> A: The kids carry the laundry up, do it -- put it in the thing and I do fold my own laundry and the kids put it away for me. . . .
>
> Q: Okay. Do you do your dishes?
>
> A: No. [The kids] either help me do the dishes or when I do do my own dishes. Just a regular set of dishes probably takes me two or three times. I run the water, let them soak, and then I get up and I wash a sink load and then I have to sit back down because I can't stand that long. My back and legs are killing me.
>
> Q: Okay. Do you do any of the vacuuming or the mopping or sweeping?
>
> A: No. Absolutely no vacuuming and no sweeping. . . .
>
> Q: Who does the grocery shopping?
>
> A: I go in with a lady. Pauline Walters. We go into town probably once a week and just pick up little necessities. In my back parking lot is Jack and Jill grocery store and if I'm so bad I can't walk over that day I'll call them and they'll have somebody bring my stuff over and get my food card.

<pre>
Q:    Okay.  And do you ever do any yard work or anything
      like that?
A:    No, ma'am. . . .
Q:    Do you take care of your own personal hygiene?
A:    I do. I do.  I can't take baths but I have a shower I
      take.
</pre>

(Administrative Record at 40-42.)

Lastly, the ALJ questioned Stoll-Miner regarding her functional abilities.  First, the ALJ asked how long Stoll-Miner could sit at one time.  Stoll-Miner replied that she could sit for 20 to 30 minutes before getting "real restless."  Second, the ALJ inquired as to how long Stoll-Miner could stand at one time.  Stoll-Miner answered that she could stand for about 10 or 15 minutes.  Third, the ALJ asked Stoll-Miner how far she could walk at one time.  She replied that she is capable of walking about three blocks at one time.  Fourth, the ALJ questioned Stoll-Miner about her ability to lift things.  Stoll-Miner stated that she could not lift groceries and could probably lift 10 pounds one time.  She further testified that she has difficulty stooping, kneeling, and climbing stairs.

Stoll-Miner's attorney also questioned Stoll-Miner at the administrative hearing.  Stoll-Miner's attorney asked Stoll-Miner whether she had difficulty sleeping.  According to Stoll-Miner, "I can't sleep more than maybe two ours at a time tops and then I'm up because I'm so sore."[2]  She also testified that she naps during the day because she is constantly fatigued.

Next, Stoll-Miner's attorney asked Stoll-Miner if there were things that make her fibromyalgia pain worse.  Stoll-Miner replied that cold weather makes her "more sore."  She also testified that if she is active during the day, the next day she is "really sore from just getting up and getting out of the house[.]"[3]  Stoll-Miner's attorney also asked Stoll-Miner how often she leaves her house:

---

[2] *See* Administrative Record at 45.

[3] *Id*. at 46.

| Q: | So are there days when you don't go out of the house at all? |
|---|---|
| A: | Probably at least five days a week. |
| Q: | When you do go out of the house where do you go? |
| A: | The only places I go are doctor's appointments, church, and to pick up a few groceries with Pauline. Those are the only places I go. |
| Q: | And how do you get to the doctor's appointment if you're -- |
| A: | Pauline Walters takes me. Pauline Walters picks me up for church, takes me to my doctor's appointments. She takes me grocery shopping. My best friend's an 84-year-old woman who is better than me. |

(Administrative Record at 46.)

Lastly, Stoll-Miner's attorney asked Stoll-Miner to discuss her difficulties with depression. Stoll-Miner testified that her depression would make working difficult because she is unable to handle change very well. She also stated that she has difficulty remembering things, and performs her everyday activities at a slow pace. Specifically, she stated "I can't finish a task from beginning to end without stopping" due to pain.[4] She also indicated that being around people makes her nervous because she doesn't "trust people."

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert George B. Paprocki with a hypothetical for an individual:

> with an exertional level limited to light work with the following limitations. They've given an occasional on all posturals. They don't, but I'm going to go ahead and give an avoid concentrated exposure to -- she said she was affected greatly by the heat and cold and humidity. Also, . . . avoid even moderate exposure to fumes, odors, dust, gases. And I'm sure that's because of the asthma and the bronchitis and all. Okay. I think that's all that I really see, and I assume the occasional was probably because of the fibromyalgia and the

---

[4] *See* Administrative Record at 51.

> obesity here that they've given an occasional on most of these
> postural limitations.

(Administrative Record at 56.) The vocational expert testified that under such limitations, Stoll-Miner could perform her past relevant work as a hotel manager and eye specialist at the light level of work, as the work is done in the national economy. The vocational expert further testified that she could not perform the hotel manager job at the medium level of work under the same limitations. The vocational expert also concluded that Stoll-Miner could perform the following work: (1) receptionist or information clerk (collectively 10,000 positions in the region and 1,100,000 positions in the nation), (2) service clerk (300 positions in the region and 30,000 positions in the nation), and clerical sorter (1,000 positions in the region and 250,000 positions in the nation).

## C. Stoll-Miner's Medical History

On October 17, 2005, Stoll-Miner presented herself at the University of Iowa Hospitals and Clinics ("UIHC") complaining of a bad cough. Dr. Susan Langbehn, M.D., noted that Stoll-Miner's cough "has been progressively worse with dyspnea, sweating while coughing, [and she has been] unable to sleep > 2 hrs."[5] Upon examination, Dr. Langbehn found that before nebulizer treatment, Stoll-Miner's air movement in her lungs, was "very poor." After nebulizer treatment, her air movement improved. Dr. Langbehn concluded that Stoll-Miner had exacerbated asthma/COPD. Stoll-Miner was admitted into the hospital and placed on an Albuterol inhaler. She was also prescribed Duoneb, Flovent, and Prednisone. Her respiratory symptoms improved and she was discharged on October 19, 2005, in stable condition. At a follow-up appointment on October 25, 2005, Stoll-Miner informed Dr. Maria Gonzalez Berlari, M.D., that she was "feeling much better, . . . breathing without difficulties, . . . exercising every day, walking ½ mile, . . . [and] not . . . smoking since [she was] discharge[d]."[6] Dr. Gonzalez Berlari recommended that Stoll-Miner continue her medication as treatment.

---

[5] *See* Administrative Record at 227.

[6] *Id.* at 217.

On March 31, 2006, Stoll-Miner was referred to the Psychiatry Department at the UIHC by the Pulmonary Rehabilitation Department due to her tearfulness and depression. Stoll-Miner informed Dr. Sarah Adlakha, D.O., that:

> she has been feeling more depressed over the past two to three weeks, and believes that she has many issues that she has not dealt with that are now coming to the surface. She states her sister was murdered by her brother in law (the sister's husband) four years ago, and this year at the time of her death anniversary the sister's daughter ([Stoll-Miner's] niece) is getting married. She feels guilty that she has not been the one to plan the wedding, and is worried about seeing the rest of the family as they have not all been together since her sister's funeral. She admits that she has a significant history of substance dependence, and claims that she was clean for about 7 years, until the death of her sister. At that time she started using again, and eventually was able to stop in 11/04. . . . She does endorse many [signs] of depression that have lasted for the last 2-3 weeks, including increased tearfulness, sleeplessness, increased appetite, depression, poor concentration, and anhedonia. She also admits that she has suicidal ideations about once per week, but states that she has no intention of killing herself and is able to report many barriers to suicide.

(Administrative Record at 261.) Dr. Adlakha noted that Stoll-Miner had three previous suicide attempts in the past. Her first suicide attempt occurred when Stoll-Miner was 22, and she overdosed on prescription medications. A few years later, Stoll-Miner "threw a blow dryer into the tub with herself."[7] Stoll-Miner's third suicide attempt occurred when she was 30, and she overdosed on her grandfather's blood pressure medication. She was hospitalized for one week on a psychiatric unit after the third suicide attempt. Dr. Adlakha further noted that "[a]ll of [Stoll-Miner's] suicide attempts were during the time when she was using illicit substances, including crack/cocaine."[8] Dr. Adlakha diagnosed Stoll-Miner with major depressive disorder and polysubstance dependence in remission.

---

[7] *See* Administrative Record at 261.

[8] *Id.*

Dr. Adlakha recommended an increase in her dosage of Wellbutrin for her depression, a two-week trial of Trazodone for her insomnia, and starting psychotherapy as treatment.

On April 7, 2006, Stoll-Miner met with David Englestad, M.A., and Dr. Frank S. Gersh, Ph.D., at the request of Disability Determination Services ("DDS"), for a psychodiagnositic mental status examination. Upon examination, Englestad and Dr. Gersh noted that Stoll-Miner was restless and sometimes agitated. Englestad and Dr. Gersh also noted that she cried frequently throughout the interview. Englestad and Dr. Gersh found her attention and concentration to be marginal, and her memory varied. Englestad and Dr. Gersh also found that her "discussion gave no overt indication of disturbed thought processes such as delusional thinking or abnormal perceptual experience, but she does have some paranoia with regard to involvement in social interactions."[9] Englestad and Dr. Gersh also concluded that Stoll-Miner has a "very negative self-esteem and restricted affect."[10] Englestad and Dr. Gersh diagnosed Stoll-Miner with polysubstance dependence, sustained full remission, major depressive disorder, anxiety disorder, and borderline personality disorder. Englestad and Dr. Gersh assessed Stoll-Miner with a GAF score of 31. Englestad and Dr. Gersh concluded that:

> [Stoll-Miner] is a 37-year-old Caucasian female who presents with significant history for physical and sexual abuse, substance abuse, depressed mood, and difficulties in employment and personal relationships related to these factors. She is currently under care at the University of Iowa Psychiatry, but continues to struggle with depressed mood and anxiety. She currently does not demonstrate the mental skills to effectively remember and understand instructions, procedures, and locations in a work setting. She appears to be challenged in her ability to carry out instructions, including maintaining attention, concentration, and pace. She would likely struggle in her interaction with supervisors, co-workers and the public because of her emotional distress. She does not appear to be one who has used good judgment and would

---

[9] *See* Administrative Record at 254.

[10] *Id.*

likely struggle with adapting to changes in the work
environment.

(Administrative Record at 254-55.)

On May 9, 2006, Dr. Claude Koons, M.D., reviewed Stoll-Miner's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Stoll-Miner. Dr. Koons determined that Stoll-Miner could: (1) occasionally lift and/or carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with normal breaks for at total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Koons further determined that Stoll-Miner should avoid concentrated exposure to extreme cold, fumes, odors, dusts gases, and poor ventilation. Dr. Koons found no postural, manipulative, visual, or communicative limitations.

On May 17, 2006, Dr. Lon Olsen, Ph.D., reviewed Stoll-Miner's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Stoll-Miner. On the Psychiatric Review Technique assessment, Dr. Olsen diagnosed Stoll-Miner with major depressive disorder, anxiety disorder, and borderline personality disorder. Dr. Olsen determined that Stoll-Miner had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Olsen determined that Stoll-Miner was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Olsen concluded that:

> [Stoll-Miner] does have [medically determinable impairments], but they would not prevent her from performing work-like activities. She would have some difficulty understanding, remembering, and carrying out detailed instructions, maintaining attention, concentration, and pace, interacting with coworkers and the public, responding appropriately to criticism from supervisors, and adjusting to changes in routine. She would be capable of activities that did not require attention to detail, sustained vigilance, rapid pace, extensive contact with coworkers or the public, intense supervisory oversight, or frequent changes in routine.

(Administrative Record at 291.)

On June 20, 2006, Stoll-Miner met with Dr. Jessica Lutz, D.O., regarding her fibromyalgia. Upon examination, Dr. Lutz noted that "[Stoll-Miner] has some difficulty getting up out of the chair in the exam room; however, once she is moving around and distracted, she has a very normal gait. She has pain with palpation all over."[11] Dr. Lutz diagnosed Stoll-Miner with fibromyalgia. Dr. Lutz prescribed Nortriptyline and Ketoprofen and recommended daily aerobic exercise as treatment.

On November 7, 2006, at the request of DDS, Stoll-Miner underwent a disability evaluation. Stoll-Miner informed Dr. Salaish K. Sarin, M.D., that she has:

> pain all the time in her joints and muscles. Her legs get numb and tingly if they are hanging. Her hands and wrists are in pain. She states that if she sits in one position, her knees, ankles, and joints hurt. She is depressed as well. She states she has gained an inordinate amount of weight while on the prednisone.

(Administrative Record at 320.) Dr. Sarin further noted that Stoll-Miner complained of fatigue, calf pain when walking, weakness in her extremities, memory difficulties, problems sleeping, and depression. Upon examination, Dr. Sarin concluded that Stoll-Miner was limited due to chronic lung problems and psychological issues which were not

---

[11] *See* Administrative Record at 304.

under control. Dr. Sarin also opined that her "fibromyalgia limits her ability to work as well."[12]

On December 1, 2006, Dr. Jan Hunter, D.O., reviewed Stoll-Miner's medical records and provided DDS with a physical RFC assessment for Stoll-Miner. Dr. Hunter determined that Stoll-Miner could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Hunter further determined that Stoll-Miner could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Hunter also opined that Stoll-Miner should avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Hunter found no manipulative, visual, or communicative limitations. Dr. Hunter concluded that:

> Review of [Stoll-Miner's activities of daily living] finds that she lives alone in a house, cares for a dog, prepares meals, cleans each week, and shops for groceries. . . . She does have fibromyalgia for which increased activity is recommended and also has a history of non-listing level asthma. The preponderance of all the evidence in this claim supports the conclusion that [Stoll-Miner] is capable as outlined.

(Administrative Record at 328.)

In March 2008, Stoll-Miner met with Dr. Kate DuChene Thoma, M.D., complaining of fibromyalgia pain. Upon examination, Dr. DuChene Thoma found that Stoll-Miner:

> has normal strength in her upper and lower extremities. Her gait is mildly impaired with a wide gait and slow. Upper extremity sensation intact. She has no swelling of any of her upper extremity joints. She is tender behind [her] occiput, her neck, her elbows, her hips and her medial knees. There is no lower extremity edema.

---

[12] *Id.* at 321.

(Administrative Record at 357.)  Dr. DuChene Thoma diagnosed Stoll-Miner with fibromyalgia.  Dr. DuChene Thoma recommended and increase in her dosage of Nortriptyline and encouraged exercise as treatment.

On December 19, 2008, Dr. J.W. Ely, Stoll-Miner's family practice physician, filled out a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" for Stoll-Miner's attorney.  Dr. Ely determined that Stoll-Miner could: (1) occasionally lift and/or carry 10 pounds, (2) frequently lift and/or carry less than 10 pounds, (3) stand and/or walk with normal breaks for less than two hours in an eight-hour workday, (4) sit with normal breaks for less than six hours in an eight-hour workday, and (5) push and/or pull with limitations in the lower extremities.  Dr. Ely also noted that Stoll-Miner would need to periodically alternate between sitting and standing to relieve pain or discomfort throughout a workday.  Dr. Ely listed peripheral neuropathy, fibromyalgia, COPD, and back pain as support for his conclusions regarding Stoll-Miner's exertional limitations.  Dr. Ely found that Stoll-Miner could occasionally climb, balance, and crawl.  Dr. Ely further found that Stoll-Miner could never kneel, crouch, or stoop. Dr. Ely determined that Stoll-Miner was limited in her ability to reach in all directions, finger, and feel with her hands.  Lastly, Dr. Ely found that Stoll-Minor should avoid temperature extremes, vibration, humidity/wetness, hazards such as machinery and heights, fumes, odors, chemicals, and gases.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Stoll-Miner is not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations.  *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003).  The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the
> claimant has a severe impairment, (3) whether the impairment
> meets the criteria of any Social Security Income listings,
> (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the
> impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Stoll-Miner had not engaged in substantial gainful activity since May 20, 2002. At the second step, the ALJ concluded from the medical evidence that Stoll-Miner had the following severe combination of impairments: chronic obstructive pulmonary disease, fibromyalgia, and obesity. At the third step, the ALJ found that Stoll-Miner did not have an impairment or

combination of impairments listed in "20 C.F.R. [§] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments)]." At the fourth step, the ALJ determined Stoll-Miner's RFC as follows:

> [Stoll-Miner] has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), but is limited to work activity involving only occasional balancing, stooping, crouching, kneeling or crawling; only occasional climbing of ramps or stairs; no concentrated exposure to heat, cold and humidity; no exposure to fumes, odors, dusts or gases[.]

(Administrative Record at 20.) Also at the fourth step, the ALJ determined that Stoll-Miner could perform her past relevant work as a hotel/motel manager and eye specialist. At the fifth step, the ALJ determined that even if Stoll-Miner could not perform the requirements of her past relevant work, based on her age, education, previous work experience, and RFC, Stoll-Miner could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Stoll-Miner was not disabled.

### B. Objections Raised By Claimant

Stoll-Miner argues that the ALJ erred in three respects. First, Stoll-Miner argues that the ALJ erred by finding her depression was not a severe impairment. Second, Stoll-Miner argues that the ALJ failed to properly evaluate the opinions of Dr. Sarin, an examining doctor, and Dr. Ely, a treating doctor. Third, Stoll-Miner argues that the ALJ failed to properly evaluate her subjective complaints of pain and disability.

### 1. Depression

Stoll-Miner argues that contrary to the ALJ's decision, her depression constitutes a severe mental impairment, and the ALJ should have considered her depression in determining whether she is disabled. Specifically, Stoll-Miner contends that the medical evidence in the record, particularly her consistent GAF scores of 60 or less shows a mental impairment of a "moderate" degree. Stoll-Miner also points out that while she agrees with the ALJ that her "physical pain and fibromyalgia affect both her social functioning and her

concentration, persistence and pace, the medical evidence does not support the ALJ's finding that her depression has only a minimal impact on these functions."[13]

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citations omitted). In other words, if the impairment would only have a minimal effect on a claimant's ability to work, then it would not constitute a severe impairment. *Id.* (citation omitted). The Eighth Circuit Court of Appeals has stated "[s]everity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that claimant failed to make this showing." *Id.* at 708 (citations omitted).

In her decision, the ALJ thoroughly discusses Stoll-Miner's history of depression and treatment for depression from 2006 to 2008.[14] The ALJ also notes that Stoll-Miner's treating psychiatrists consistently assessed her GAF score at 60.[15] The ALJ concludes, however, that Stoll-Miner's "depression . . . do[es] not cause more than mild limitations in functionality, and [is] therefore not considered severe for the purpose of this decision."[16] Specifically, the ALJ found that:

> In social functioning, [Stoll-Miner] has moderate difficulties. . . . Although [Stoll-Miner's] social skills are somewhat impaired, [she] retains the ability to retain friendships and develop relationships. There is evidence [Stoll-Miner] has moderate difficulties in social functioning, however, the undersigned finds this is due to her physical pain and reported physical restrictions, and not due to depression. . . .

---

[13] *See* Stoll-Miner's Brief (docket number 15) at 7-8.

[14] *See* Administrative Record at 16-18.

[15] *Id.*

[16] *Id.* at 18.

There is evidence [Stoll-Miner] has moderate difficulties in maintaining concentration, persistence or pace; however, the undersigned finds these problems are due to her physical pain and reported physical restrictions, and not due to any severe mental impairment. . . .

The undersigned finds [Stoll-Miner's] . . . depression cause[s] no more than mild limitations in mental functionality, and [is] therefore not considered [a] severe impairment[] for the purpose of this decision. . . .

(Administrative Record at 18-19.)

The Court finds it troubling that the ALJ offers no explanation or reasons for concluding that Stoll-Miner's moderate difficulties in social functioning and maintaining concentration, persistence, or pace are due only to her physical pain and reported physical restrictions, and not her depression. The ALJ's lack of an explanation is even more troubling after a thorough review of the record, because the record demonstrates that: (1) three different doctors diagnosed Stoll-Miner with major depressive disorder; (2) two of the three doctors also diagnosed Stoll-Miner with anxiety and borderline personality disorder; and (3) Stoll-Miner's treating psychiatrist consistently assessed her GAF score at 60 from 2006 through 2008.[17] Specifically, Englestad and Dr. Gersh concluded that based on Stoll-Miner's mental functioning:

She currently does not demonstrate the mental skills to effectively remember and understand instructions, procedures, and locations in a work setting. She appears to be challenged in her ability to carry out instructions, including maintaining attention, concentration, and pace. She would likely struggle

---

[17] Global Assessment of Function (GAF) is a "numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living." *See* Global Assessment of Functioning at http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

A GAF score between 51-60 indicates "[m]oderate symptoms OR any moderate difficulty in social, occupational, or school functioning." *See* Global Assessment of Functioning at http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

> in her interaction with supervisors, co-workers and the public
> because of her emotional distress. She does not appear to be
> one who has used good judgment and would likely struggle
> with adapting to changes in the work environment.

(Administrative Record at 254-55.) Similarly, Dr. Olsen, after reviewing Stoll-Miner's

mental health records, concluded that:

> [Stoll-Miner] would have some difficulty understanding,
> remembering, and carrying out detailed instructions,
> maintaining attention, concentration, and pace, interacting with
> coworkers and the public, responding appropriately to
> criticism from supervisors, and adjusting to changes in routine.
> she would be capable of activities that did not require attention
> to detail, sustained vigilance, rapid pace, extensive contact
> with coworkers or the public, intense supervisory oversight, or
> frequent changes in routine.

(Administrative Record at 291.)

Moreover, a GAF score is a determination based on a scale of 1 to 100 of a

"clinician's judgment of the individual's overall level of functioning." *Hudson ex rel.*

*Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting *Diagnostic and*

*Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000)). The Eighth

Circuit has noted that a GAF score between 51 and 60 is "indicative of 'moderate

symptoms' or 'moderate difficulty in social, occupational, or school functioning.'"

*Lacroix v. Barnhart*, 465 F.3d 881, 883 (8th Cir. 2006) (quotation omitted). In *Pate-Fires*

*v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009), the Eighth Circuit found that a GAF score

in the 51-60 range was not "inconsistent with [an] opinion that [the claimant] was

permanently disabled for any type of employment, nor does it constitute substantial

evidence supporting the ALJ's conclusion she is not disabled." *Id.* (citation omitted).

Here, Stoll-Miner was consistently assessed a GAF score of 60 by her treating psychiatrist,

indicating moderate symptoms or moderate difficulty in social and occupational

functioning. *See Lacroix*, 465 F.3d at 883. Such a score is consistent with the findings

of Englestad and Dr. Gersh and Dr. Olsen, who also found moderate difficulties in

maintaining social functioning, and in maintaining concentration, persistence, or pace.

Therefore, the Court is at a loss, without further explanation, for understanding the ALJ's conclusion that Stoll-Miner's moderate difficulties in social functioning and maintaining concentration, persistence, or pace are due only to her physical pain and reported physical restrictions, and not her depression. It is axiomatic that an ALJ must not substitute his or her opinions for those of a physician. *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008) (citation omitted). An ALJ must also develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts v. Apfel*, 143 F.3d 1134, 1138 (8th Cir. 1998) (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)). Accordingly, the Court finds that remand is necessary for the ALJ to fully and fairly develop the record with regard to Stoll-Miner's depression, and how her depression relates to whether she is disabled. Specifically, on remand, the ALJ shall fully and fairly develop the record as to whether Stoll-Miner's depression is a severe impairment, and if so, how such a finding relates to her RFC and ultimate disability determination.

### 2. *Opinions of Drs. Sarin and Ely*

Stoll-Miner argues that the ALJ improperly rejected the opinions of Dr. Sarin and Dr. Ely. In particular, Stoll-Miner questions the ALJ's rationale for discounting the opinions of Drs. Sarin and Ely. Specifically, Stoll-Miner points out that:

> The ALJ rejected the opinions of the treating and examining physicians largely because their reports 'fail to reveal the type of significant clinical and laboratory abnormalities one would expect to if [Stoll-Miner] were in fact disabled. . .' and there was no 'functional assessment attached or referenced.' The ALJ did not specify what types of 'significant clinical and laboratory abnormalities' she expected, or what type of 'functional assessment' she believed was necessary to support the doctor's opinions.

(Stoll-Miner's Brief (docket number 15) at 10.)

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v.*

*Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

Furthermore, an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)).

In her decision, the ALJ discounted Dr. Sarin's opinions as follows:

> Dr. Sarin concluded [Stoll-Miner] had fibromyalgia which limited her ability to work, but this opinion is given little weight where there is no functional limitation referenced or included in support of this opinion, and where [Stoll-Miner's] physical examination was unremarkable. . . . The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Stoll-Miner] were in fact disabled, and the doctor did not specifically address this weakness.

(Administrative Record at 22.) Similarly, the ALJ provided the following rationale for rejecting the opinions of Dr. Ely:

> Although Dr. Ely completed a medical source residual functional capacity assessment dated December 19, 2008, assessing [Stoll-Miner] with the ability to do less than a full range of sedentary work, this opinion is given little weight where there are no medical records from Dr. Ely that could support this assessment, and no functional assessment attached or referenced. The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Stoll-Miner] were in fact disabled, and the doctor did not specifically address this weakness.

(Administrative Record at 23.) The ALJ does not address or explain her reasons for rejecting the opinions of Drs. Sarin and Ely. The ALJ simply makes conclusory observations that Drs. Sarin's and Ely's opinions are not supported by treatment records, functional assessments, or the "type of significant clinical and laboratory abnormalities one would expect if [Stoll-Miner] were in fact disabled." The ALJ does not address, however, any medical evidence in the record, or what "significant clinical and laboratory

24

abnormalities one would expect if [Stoll-Miner] were in fact disabled," to support her conclusion that Drs. Sarin's and Ely's opinions should be rejected.

An ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. The regulations require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The Court finds that the ALJ has failed to meet these requirements. The ALJ did not provide any reasons other than conclusory statements, let alone "good reasons," for rejecting the opinions of Drs. Sarin and Ely. Therefore, the Court finds that this matter should be remanded so that the ALJ may fully and fairly develop the record with regard to Drs. Sarin's and Ely's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Drs. Sarin's and Ely's opinions and support her reasons with evidence from the record.

Additionally, the ALJ's decision suggests that she did not have enough information from Drs. Sarin and Ely to properly evaluate their opinions. Specifically, the ALJ affords little weight to the opinions of Drs. Sarin and Ely because the record contained no reference to functional limitations to support their opinions. The ALJ also noted that the record contained no medical records from Dr. Ely, a treating source, supporting his opinions. It is appropriate for an ALJ to "seek additional clarifying statements from a treating physician" when a crucial issue is undeveloped. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (citation omitted). An ALJ should only contact a treating physician "if the doctor's records are 'inadequate for us to determine whether the claimant is disabled' such as 'when the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" *Goff*, 421 F.3d at 791 (citing 20 C.F.R. §§ 404.1512(e) and 416.912(e)). An ALJ may also order medical examinations and tests when the medical records presented to him or her constitute insufficient medical evidence to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (citation omitted); *see also* 20 C.F.R. § 404.1519a(a)(1) ("The decision to purchase a consultative examination . . . will be made after we have given full consideration to whether the additional

information needed is readily available from the records of your medical sources.").
Additionally, 20 C.F.R. § 404.1519a(b) provides that "[a] consultative examination may
be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient
to support a decision on . . . [the] claim." *Id*. For example, a consultative examination
should be purchased when "[t]he additional evidence needed is not contained in the records
of your medical sources." 20 C.F.R. § 404.1519a(b)(1).

After reviewing the record, the Court concludes that Drs. Sarin's and Ely's medical
records are inadequate for the ALJ to determine whether Stoll-Miner is disabled. *See*
*Goff*, 421 F.3d at 791 (An ALJ should contact a treating physician "if the doctor's records
are 'inadequate for us to determine whether the claimant is disabled' such as 'when the
report does not contain all the necessary information, or does not appear to be based on
medically acceptable clinical and laboratory diagnostic techniques.'") (citing 20 C.F.R.
§§ 404.1512(e) and 416.912(e)). The Court finds that the ALJ failed to fully and fairly
develop the record for purposes of evaluating the opinions of Dr. Sarin and Ely. *See Cox*,
495 F.3d at 618. On remand, the ALJ should recontact Drs. Sarin and Ely to seek
clarification of their opinions regarding Stoll-Miner's physical limitations and obtain
supporting medical evidence, in order to properly evaluate their opinions. Additionally,
if after recontacting the physicians, further examination is necessary to provide a complete
record on the issue of Stoll-Miner's physical limitations, then a consultative examination
should be purchased. *See Barrett*, 38 F.3d at 1023; 20 C.F.R. § 404.1519a.

### 3.    *Credibility Determination*

When evaluating the credibility of a claimant's subjective complaints, the ALJ may
not disregard them "solely because the objective medical evidence does not fully support
them." *Polaski*, 739 F.2d at 1322. However, the absence of objective medical evidence
to support a claimant's subjective complaints is a relevant factor for an ALJ to consider.
*Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must
give full consideration to all the evidence presented relating to subjective complaints,
including the claimant's prior work record, and observations by third parties and treating

and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski*, 739 F.2d at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (citing *Polaski*, 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson*, 361 F.3d at 1072). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence).

Stoll-Miner argues that the ALJ's credibility determination is faulty because she "relied on . . . misstatements of the record to support her finding that [Stoll-Miner's] testimony was inaccurate[.]"[18] In her brief, Stoll-Miner points out the following inaccuracies in the ALJ's decision:

- *ALJ decision*: "Although the claimant testified she could only sit for 2-3 minutes before she has to stand up, at which point the claimant had been sitting for approximately 35 minutes... [Administrative Record at] 21.
  *Claimant's testimony*: "Q: How long do you think you can sit at a time? A: About 20, 30 minutes..." [Administrative Record at] 42.

- *ALJ decision*: "the claimant testified she refuses to take any prescription pain medication..." [Administrative Record at] 21.
  *Claimant's testimony*: Claimant is unable to take narcotic pain medications because of her history of

---

[18] *See* Stoll-Miner's Brief (docket number 15) at 13.

cocaine addiction. However, she testified that she takes nortriptyline, amitriptyline, trazadone, and ketoprofen. She also tried alternative treatments, including acupuncture and pool therapy. [Administrative Record at] 39, 44, 214.

- *ALJ decision*: "the claimant testified she cannot climb stairs, but also testified her apartment is up one flight of stairs. Therefore, he claimant must climb stairs periodically in order to gain admittance to her apartment." [Administrative Record at] 21. Claimant's testimony: Q: "is this a house or a mobile home, apartment, what? A: [A]partment. Q: And does it have stairs or is it one level? A: A floor entrance. I have moved downstairs because I couldn't do stairs any more." [Administrative Record at] 33.

(Stoll-Miner's Brief (docket number 15) at 13-14.)

The Court has carefully reviewed the record, and finds that Stoll-Miner correctly pointed out significant inaccuracies in the ALJ's credibility determination. Moreover, the ALJ's decision and credibility determination also lacks any discussion or consideration of the *Polaski* factors. Due to the serious flaws in the ALJ's credibility determination, the Court finds that this matter should be remanded for a proper credibility determination. The ALJ is instructed to make a proper credibility finding for Stoll-Miner and explain her credibility determinations for Stoll-Miner with good reasons and evidence from the record.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or

her] disability by medical evidence on the record as a whole,
we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to fully and fairly develop the record with regard to the severity of Stoll-Miner's depression and the effects of her depression on her RFC and ultimate disability determination. The ALJ also failed to fully and fairly develop the record with regard to the opinions of Drs. Sarin and Ely. Finally, the ALJ failed to provide a proper credibility determination for Stoll-Miner. Accordingly, the Court finds that remand is appropriate.

## *VI. CONCLUSION*

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall fully and fairly develop the record as to whether Stoll-Miner's depression is a severe impairment, and if so, how such a finding relates to her RFC and final disability determination. The ALJ must also fully and fairly develop the record with regard to the opinions of Drs. Sarin and Ely and provide clear reasons for accepting or rejecting their opinions and support her reasons with evidence from the record. The ALJ should also recontact Drs. Sarin and Ely to seek clarification of their opinions regarding Stoll-Miner's physical limitations and obtain supporting medical evidence, in order to properly evaluate their opinions. Lastly, the ALJ is instructed to make a proper credibility determination in accordance with the requirements set forth in *Polaski*.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this ___6th___ day of May, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA